**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |
|---|---|
| **MATTHEW MCDONALD, and MCDHOLDINGS, LLC,**<br><br>            **Plaintiffs,**<br><br>        **v.**<br><br>**EDWARD G. ROBINSON III, EDWARD G. ROBINSON III CONSULTING, LLC, CARLA DESILVA MCPHUN, CADEM CAPITAL GROUP, CHOICE MANAGEMENT, LLC, and CHRISTIAN E. D'ANDRADE,**<br><br>            **Defendants.** | **Civil Action No. 1:18-cv-697-LMB/TCB** |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT**
**JUDGMENTS AGAINST D'ANDRADE AND MCPHUN DEFENDANTS**

# TABLE OF CONTENTS

I.   GENERAL SUMMARY OF FACTS APPLICABLE TO ALL CLAIMS ........................... 2

    A.   MCDH Was A Victim Of An Elaborate Enterprise Formed To Illicit
        Fraudulent Investments ........................................................................... 2

    B.   Additional Facts Related To Criminal Proceedings ...................................... 4

    C.   MCDH's Damages ................................................................................... 6

II.  EVALUATION OF THE COMPLAINT ................................................................... 7

    A.   Legal Standard For Evaluating The Complaint ........................................... 7

    B.   Each Claim In The Verified Complaint States A Cognizable Cause Of
        Action ................................................................................................... 8

           1.   COUNT VI (Common Law Fraud Against McPhun and
               D'Andrade) ................................................................................ 8

               a.   Legal standard to state a claim for common law fraud ...................... 8

               b.   The Verified Complaint states each element of common
                   law fraud with respect to the Devilwood Investment and
                   Investments 3 and 7-12 ................................................... 9

                   i.   DEVILWOOD INVESTMENT ........................................ 9

                   ii.   INVESTMENT 3 .............................................................. 9

                   iii.   INVESTMENT 7 ............................................................. 10

                   iv.   INVESTMENT 8 ............................................................. 10

                   v.   INVESTMENT 9 ............................................................. 10

                   vi.   INVESTMENT 10 ........................................................... 11

                   vii.   INVESTMENT 11 ........................................................... 11

                   viii.   INVESTMENT 12 ........................................................... 12

                 c.   Punitive damages ............................................................. 13

           2.   COUNT IV (Business Conspiracy, Va. Code §§ 18.2-499 and -500) ......... 14

     a.     Legal standard to state a claim for violation of the Virginia Business Conspiracy Statute ............................................................. 14

     b.     The Verified Complaint states a claim for violation of the Virginia Business Conspiracy Statute against All Defendants ....... 14

     c.     Damages for statutory conspiracy claims ........................................ 16

3.     COUNT V (Common Law Conspiracy) ....................................................... 17

     a.     Legal standard to state a claim for common law conspiracy ........... 17

4.     COUNT I-III (Violations of the RICO Act, 18 U.S.C. § 1962(b), (c), and (d)) ................................................................................................. 17

     a.     Legal standard to state a claim under the RICO Act ....................... 17

     b.     The Verified Complaint alleges an association in fact Enterprise ... 18

     c.     The Verified Complaint alleges McPhun and D'Andrade engaged in a pattern of racketeering activity .................................. 18

     d.     The Verified Complaint alleges all necessary elements for civil RICO claims under 18 U.S.C. § 1962(b)-(d) ......................... 22

     e.     Damages for RICO violations .......................................................... 23

5.     COUNT VII (Violations of the SEC Act of 1934 and the Exchange Act Rule 10b-5) ......................................................................................... 23

     a.     Legal standard to state a federal securities law claim ..................... 23

     b.     The Verified Complaint states a claim under 15 U.S.C. §78j(b and 17 C.F.R. § 204.10b-5 ("Rule 10b-5") .................................... 24

     c.     Damages for federal securities law claims ....................................... 24

6.     COUNT VIII (Violations of State Securities Laws, Va. Code §§ 13.1-522, et seq.) ................................................................................... 24

     a.     Legal standard to state a claim under Va. Code §§ 13.1-522, et seq. ............................................................................................ 24

     b.     The Verified Complaint states a claim under Va. Code §§ 13.1-522, et seq. ............................................................................ 25

c.    Damages for state securities law claims  ........................................... 25

7.    COUNT IX (Breach of Contract)  ................................................................. 26

a.    Legal standard to state a claim for breach of contract  .................... 26

b.    The Verified Complaint states claims for breach of
contract against McPhun, individually and on behalf of
Cadem and Choice Management; and D'Andrade  ......................... 26

c.    Damages for breach of contract  ....................................................... 27

8.    COUNT XI (Conversion)  ............................................................................. 27

a.    Legal standard to state a claim for conversion ................................ 27

b.    The Verified Complaint states a claim for conversion against
Choice Management, McPhun, and D'Andrade in connection
with the Devilwood Investment and Investments 7, 8, 9,
and 11  ............................................................................................... 28

9.    COUNT X (Unjust Enrichment)  ................................................................... 28

a.    Legal standard to state a claim for unjust enrichment  .................... 28

b.    The Verified Complaint states a claim for unjust enrichment
against McPhun in the amount of $35,000  ...................................... 29

c.    The Verified Complaint states a claim for unjust enrichment
against McPhun and Choice Management in the amount of
$150,000 ........................................................................................... 29

III.    CONCLUSION ............................................................................................................ 30

CERTIFICATE OF SERVICE

Plaintiffs Matthew McDonald ("McDonald") and McDHoldings, LLC ("MCDH," or, collectively with McDonald, "Plaintiffs"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 55(b) and this Court's January 10, 2019 Order, hereby submit this supplemental memorandum to demonstrate specifically how they are entitled to relief under each Count of the Verified Complaint as well as the amount of damages that should be awarded against each Defendant[1] in default under each count. (*See* Doc. 202.)

Plaintiffs' Verified Complaint asserts the following claims against the following Defendants in default: (a) violations of 18 U.S.C. §§ 1962(b), (c), and (d) of the Racketeer Influenced and Corrupt Organizations ("RICO") Act against McPhun and D'Andrade (Counts I-III); (b) violations of the Virginia Business Conspiracy Statute (Va. Code § 18.2-500) against all Defendants (Count IV); (c) common law conspiracy against all Defendants (Count V); (d) common law fraud against McPhun and D'Andrade (Count VI); (e) securities fraud in violation of the SEC Act of 1934 and the Exchange Act Rule 10b-5 against McPhun and D'Andrade (Count VII); (f) securities fraud in violation of Va. Code §§ 13.1-522, *et seq.* against McPhun and D'Andrade (Count VIII); (g) breach of contract against all Defendants (Count IX); (h) unjust enrichment  against McPhun (Count X); (i) conversion against McPhun, Choice Management, and D'Andrade (Count XI); and (j) punitive damages against all Defendants (Count XII). Counts I-IV of Plaintiffs' Verified Complaint entitle Plaintiffs to treble damages, attorneys' fees, and costs pursuant to 18 U.S.C. § 1964(c) and Va. Code § 18.2-500.  (Doc. 1, ¶¶ 238-308.)

---

[1] Defendants Carla DeSilva McPhun ("McPhun"), Cadem Capital Group ("Cadem"), and Choice Management, LLC ("Choice Management") are collectively referred to herein as the "McPhun Defendants."  McPhun is the president and owner of Cadem and Choice Management.  The McPhun Defendants and Christian E. D'Andrade ("D'Andrade") are collectively referred to herein as "Defendants."

Attorneys' fees and costs are also available under Count VIII for state securities fraud.  *See* Va. Code § 13.1-522A.

## I.    GENERAL SUMMARY OF FACTS APPLICABLE TO ALL CLAIMS.

The following allegations from the Verified Complaint set forth the core facts supporting Plaintiffs' claims.  As illustrated herein, the Court should find Plaintiffs stated claims under each count and enter judgment against Defendants, jointly and severally, in favor of MCDH,[2] for $4,096,705.95, and no less than $395,532.91 in attorneys' fees and expenses, plus post-judgment interest at the statutory rate, pursuant to Count IV, or Counts I-III, which yield the maximum damages available.

### A.    MCDH Was A Victim Of An Elaborate Enterprise Formed To Illicit Fraudulent Investments.

McDonald is the founder and owner of McDStudio, LLC ("McDStudio").  (*Id.*, ¶ 14.) Edward Robinson[3] ("Robinson") hired McDStudio to provide routine architectural services.  (*Id.*, ¶¶ 15-16.)  Robinson told McDonald he was a real estate investor and the owner of EGIII Consulting, LLC ("EGIII").  (*Id.*, ¶¶ 17-19.)  Robinson then used his burgeoning relationship with McDonald to induce him into making real estate investments brokered by Robinson.  (*Id.*, ¶¶ 25-43.)  McDonald and his family created MCDH, a limited liability company of which he is a member and agent, for the purpose of making real estate investments.  (*Id.*, ¶ 7.)  Robinson

---

[2] McDonald was named as an individual plaintiff in the event that any Defendant contested liability to MCDH.  However, because the Defendants are in default and have either waived applicable defenses or, with respect to the McPhun Defendants, are barred from making defenses (*see* Doc 195), the full amount of the default judgment should be entered in favor of MCDH because it is the entity that paid the funds to Defendants.  Investments 3 ($35,000) and 8 ($10,000) are the only transactions where McDonald made a payment to a Defendant directly from his personal funds.  However, McDonald made those payments as an agent for and member of MCDH, on behalf of MCDH.  (*See* Doc. 1, ¶¶ 7, 98.)  The Court, therefore, may enter default judgment in favor of MCDH on all counts.

[3] Robinson is a former co-defendant.  (*See* Doc. 179.)

introduced McDonald to McPhun, who Robinson described as a sophisticated real estate investor who purchased houses in bulk off of foreclosure lists and then sold them for profit. (*Id.*, ¶ 28.) Robinson served as an agent to the McPhun Defendants and D'Andrade with respect to soliciting and brokering investments from MCDH. (*Id.*, *e.g.*, ¶¶ 25-26, 55, 65, 174, 228; Doc. 1-13.)

Using two successful investments ("Investments 1-2") as proof of results, Robinson invited MCDH to invest in other endeavors offered by the McPhun Defendants. (*See id.*, ¶¶ 43-144.) Robinson and McPhun falsely represented to MCDH that McPhun would invest MCDH's funds in real estate. (*Id.*, ¶¶ 1, 37, 42, 58, 62.) By mid-May 2017, McPhun owed MCDH $41,300, and Cadem owed MCDH $308,000 in overdue payments. (*Id.*, ¶¶ 131, 146.)

Over the course of the next eight months, Defendants induced an additional $479,000 out of MCDH by preying on Plaintiffs' fear that prior investments would not be paid and by giving Plaintiffs false hopes that the delayed payments owed to MCDH could be repaid if MCDH paid additional funds. (*See id.*, ¶¶ 145-219.) Defendants eventually revealed that one of the largest supposed real estate investments, Investment 7, was used for the "D'Andrade Project." (*Id.*, ¶ 125.) McPhun's and Robinson's false representations regarding the D'Andrade Project included:

- D'Andrade and his business partners had purchased a powerful piece of software at a significant discount in Europe, but that the software was being held pending payment of a penalty tax incurred by its prior owner. (*Id.*, ¶¶ 149-50.)

- The passport of one of D'Andrade's associates had been seized by European authorities to secure payment of the penalty tax for his software, but that if she could get her passport back, she could travel to Dubai and complete another deal that would provide sufficient funds to repay Plaintiffs. (*Id.*, ¶ 151.)

- D'Andrade's unexpected issues in Europe had left him without sufficient liquid assets to make his upcoming mortgage payment, and that if D'Andrade did not come up with $20,000 quickly, he risked defaulting on his mortgage. (*Id.*, ¶ 152.)

- One of D'Andrade's other investors was dying of cancer. (*Id.*, ¶ 182.)

- MCDH's investments were secured. (*See id.*, ¶¶ 173, 190.)

3

These excuses and explanations for needing additional money mirror those described in the FBI Affidavit supporting the criminal complaint against Keisha Williams ("Williams"), who was indicted on April 20, 2018 on nine counts of wire fraud and three counts of engaging in financial transactions in illegal proceeds.[4]  (*See id.*, ¶¶ 223-27; *see generally United States v. Williams*, E.D. Va. Case No. 1:18-CR-160, Doc. 2.)

### B.    Additional Facts Related To Criminal Proceedings.

Approximately three months after Plaintiffs filed the Verified Complaint, McPhun and D'Andrade each pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 in connection with the same scheme that was the subject of the Williams indictment.

On September 17, 2018, McPhun pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 and was sentenced on December 10, 2018.  (*See United States v. McPhun*, E.D. Va. No. 1:18-cr-333-LMB, Docs. 8, 24-25.)  In doing so, she admitted that:

> On or about March 10, 2017, in the Eastern District of Virginia and elsewhere, [she] *devised a scheme and artifice to defraud*, and to obtain money by means of materially false and fraudulent pretenses and representations from M.W., in order to provide money to Keisha Williams.  *Having devised the scheme*, [she] knowingly caused to be transmitted by means of wire communications in interstate commerce writings, signs, and signals for the purpose of executing the scheme and artifice to defraud[.]

(*Id.*, Doc. 6 (emphasis added).)  The Statement of Facts supporting the Plea Agreement avers that, in furtherance of the referenced scheme and artifice to defraud, McPhun "obtained approximately $1 million for D'Andrade and Williams from others who were willing to loan money."  (*Id.*, Doc. 9, ¶ 4.)  MCDH is among these "others."

---

[4] The Court may take judicial notice of the facts set forth in the publicly filed FBI Affidavit.  *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records") (internal citation and quotation marks omitted).

4

On September 19, 2018, D'Andrade pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. (*See United States v. D'Andrade*, E.D. Va. No. 1:18-cr-332-LMB, Doc. 6.) In doing so, he admitted that:

> On or about January 1, 2018, in the Eastern District of Virginia and elsewhere, [he] ***devised a scheme and artifice to defraud***, and to obtain money by means of materially false and fraudulent pretenses and representations from certain individuals[, including victim K.R.,] in order to provide to Keisha Williams, knowingly caused to be transmitted by means of wire communications in interstate commerce writings, signs, and signals for the purpose of executing the scheme and artifice to defraud[.]

(*Id.*, Doc. 3 (emphasis added).) The Statement of Facts supporting the Plea Agreement avers that, in furtherance of his scheme and artifice to defraud, D'Andrade "caused others to send Williams money directly, and through him, in amounts totaling almost $4 million." (*Id.*, Doc. 7, ¶ 9.) Plaintiffs were among these "others." D'Andrade was sentenced on December 14, 2018. (*Id.*, Docs. 24-25.)

Plaintiffs were defrauded by Defendants as part of the same scheme that led to McPhun's and D'Andrade's convictions. As illustrated below, the Enterprise described by the Verified Complaint is a "separate and smaller fraud scheme" that appears to overlap with the larger criminal scheme described by Williams's indictment. (*See United States v. D'Andrade*, Doc. 21 at 1; *United States v. McPhun*, Doc. 23 at 1 (describing the same "separate and smaller fraud scheme").) There is evidence, for example, that Defendants transferred $68,000 MCDH paid into the Enterprise to Williams (*United States v. McPhun*, Doc. 23 at 8; *United States v. D'Andrade*, Doc. 27.) However, the amount of MCDH's funds the Government claims was transferred to Williams is only a fraction of the total amount that the Defendants fraudulently obtained from MCDH. Based on the outcome of the criminal cases, it appears D'Andrade and McPhun replicated Williams's scheme for the benefit of themselves, using the same rhetoric, tactics, and misrepresentations that they used to broker funds from other victims.

5



### C.    MCDH's Damages.

The following transactions caused MCDH to suffer the following out-of-pocket losses:

| Transaction | Date of Investment | Principal Investment | Payee of Fraudulent Investment |
|---|---|---|---|
| Devilwood | 11/22/2016 | $150,000 | Choice Management (McPhun) |
| Investment 3 | 02/16/2017 | $35,000 | EGIII (Robinson) |
| Investment 7 | 04/20/2017 | $220,000 | McPhun |
| Investment 8 | 05/17/2017 | $10,000 | D'Andrade |
| Investment 9 | 06/05/2017 | $73,000 | D'Andrade |
| Investment 10 | 07/07/2017 | $180,000 | EGIII (Robinson) |
| Investment 11 | 08/07/2017 | $160,000 | McPhun |
| Investment 12 | 12/27/2017 | $56,000 | Teresa Bunnag |
| **TOTAL:** | | **$884,000** | |

(*See generally* Doc. 185-4, "McDonald Damages Aff.")

In addition to the unpaid principal amounts listed above, MCDH was damaged in the amounts of $392,500 for unpaid contractually guaranteed returns, $40,775 for unpaid contractually guaranteed penalties, and $48,293.65 in interest, totaling $1,365,568.65 in compensatory damages due. (*Id.* at Ex. 1.) All of these damages are verified by the Affidavit of Matthew McDonald and Exhibits thereto, which was previously filed in support of Plaintiffs' Motion for Default Judgment and is incorporated here by reference. (*See id.*) Exhibit 1 to the

McDonald Damages Affidavit is a detailed spreadsheet itemizing all of MCDH's losses as of December 13, 2018.[5]

Plaintiffs have also incurred at least $395,532.91 in attorneys' fees and expenses, as evidenced by the Declaration of undersigned counsel ("Attorneys' Fees Decl.") and Exhibits thereto, previously filed in support of Plaintiffs' Motion for Default Judgment, which is also incorporated here by reference.  (*See* Doc. 185-5 at 7.)

## II.   EVALUATION OF THE COMPLAINT.

### A.   Legal Standard For Evaluating The Complaint.

Upon default, "factual allegations in the complaint are deemed admitted and the 'appropriate inquiry is whether or not the face of the pleadings supports the default judgment and the causes of action therein.'"  *JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va. 2014) (quoting *Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians*, 187 F.3d 628, 1999 WL 598860, at *1 (4th Cir. Aug. 10, 1999) (per curium) (unpublished table opinion)). Put differently, before entering a default judgment, the court must evaluate whether "the complaint properly states a claim."  *Johnson v. Robert Shields Interiors, Inc.*, No. 1:15-cv-820, 2016 WL 2739270, at *6 (E.D. Va. May 11, 2016).  This inquiry is evaluated "against the standards of Federal Rule of Civil Procedure 12(b)(6)."  *Id.*

---

[5] The McDonald Damages Affidavit itemizes the amount of pre-judgment interest accrued as of December 13, 2018.  The pre-judgment interest calculation for Investment 11 is based on a contractual guarantee, and the pre-judgment interest calculations for all other transactions are based on the statutory pre-judgment interest rate of 6%.  *See* Va. Code § 6.2-302.

**B.      Each Claim In The Verified Complaint States A Cognizable Cause Of Action.**

1.      <u>COUNT VI (Common Law Fraud Against McPhun and D'Andrade).</u>[6]

*a.      Legal standard to state a claim for common law fraud.*

The elements of common law fraud are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance thereon by the party misled, and (6) resulting damage to the party misled." *Owens v. DRS Automotive Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014).   The defendant need not have made the false representation directly to the plaintiff; rather, a plaintiff must show that the defendant "has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this misrepresentation." *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994).   When a person "makes [a] promise, intending not to perform, his promise is a representation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud." *Colonial Ford Truck Sales, Inc. v. Schneider*, 325 S.E.2d 91, 94 (Va. 1985).   In addition, the "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Van Deusen v. Snead*, 441 S.E.2d 207, 210 (Va. 1994) (quoting *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 597 (Va. 1984)).   A principal can commit fraud through its agent. *See, e.g.*, *J.F. Toner & Son, Inc. v. Staunton Production Credit Ass'n*, 375 S.E.2d 530, 530 (Va. 1989); *Allen Realty Corp.*, 318 S.E.2d at 595-596.

---

[6] This memorandum begins by addressing the adequacy of Plaintiffs' allegations with respect to Count VI because the common law fraud allegations provide the predicate acts which support Counts I-III for RICO violations, Counts IV and V for statutory conspiracy and common law conspiracy, Counts VII and VIII for federal and state securities law violations, Count X for unjust enrichment, and Count XI for conversion.

        b.      *The Verified Complaint states each element of common law fraud with respect to the Devilwood Investment and Investments 3 and 7-12.*

### i. DEVILWOOD INVESTMENT

On or about November 22, 2016, Robinson, acting as an agent for McPhun and Choice Managment, sent McDonald an e-mail attaching the Devilwood Agreement, which came from McPhun, and represented that the investment would entail acquiring a foreclosure property using a $150,000 investment from MCDH. (Doc. 1, ¶ 45.) McPhun and Robinson knew the Devilwood Agreement's representations were false, provided MCDH the Devilwood Agreement with the intent to mislead, and neither McPhun nor Robinson intended to perform under the Devilwood Agreement. (*Id.*, ¶ 49.) MCDH relied on McPhun's and her agent's intentionally false representation, (*id.*, ¶¶ 48-49), which caused MCDH to pay in part by check and in part by wire $150,000 to McPhun's company, Choice Management, (*id.*, ¶¶ 48, 60).[7] McPhun never repaid MCDH this principal. (*Id.*)

### ii. INVESTMENT 3

On or about February 15, 2017, Robinson, acting as an agent for McPhun, told McDonald, via telephone, that if MCDH invested $35,000 in a real estate endeavor, it would receive a guaranteed return of 18% by May 2017. (*Id.*, ¶ 67.) Robinson knew the representation was false, made it with the intent to mislead MCDH, and neither McPhun nor Robinson had any intention to repay MCDH's $35,000 investment. (*Id.*, ¶¶ 69-70.) MCDH relied on McPhun's and her agent's intentionally false representation, (*id.*, ¶¶ 72, 75-76), which caused McDonald, as

---

[7] This misrepresentation, as well as all others described below relating to Investments 3 and 7-12, concerned a material fact because the misrepresentations influenced MCDH to invest. *See, e.g.*, *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 691 (E.D. Va. 1990) ("A fact is material when it influences a person to enter into a contract," or "when it deceives him and induces him to act." (quoting 23 Am. Jur., Fraud and Deceit, § 111 at 892)).

MCDH's agent, to pay by check $35,000 to EGIII, (*id.*, ¶¶ 76-79). Neither McPhun nor Robinson repaid MCDH this principal, the contractually guaranteed return, or contractual penalties. (*See* Doc. 185-4 at 4-5, Ex. 1.)

### iii. INVESTMENT 7

On or about April 19, 2016, McPhun told McDonald, via telephone, that Williams would not be involved in Investment 7, the D'Andrade Project. (Doc. 1, ¶ 139.) McPhun knew the representation was false and made it with the intent to mislead MCDH. (*Id.*, ¶ 140.) MCDH relied on McPhun's intentionally false representation, (*id.*, ¶¶ 140-41), which caused MCDH to wire $220,000 to McPhun, (*id.*, ¶¶ 141-42, 144.) McPhun never repaid MCDH this principal or the contractually guaranteed return. (*See* Doc. 185-4 at 5-6, Ex. 1.)

### iv. INVESTMENT 8

On or about May 15, 2017, Robinson, acting as an agent for McPhun and D'Andrade, represented to McDonald, via telephone, that D'Andrade risked defaulting on his mortgage if he did not come up with $20,000 quickly, and that Robinson would be contributing $10,000 of his own money to help D'Andrade. (Doc. 1, ¶¶ 152, 154.) Robinson knew the representations were false, and made them with the intent to mislead McDonald into another alleged investment with McPhun and D'Andrade. (*Id.*, ¶¶ 154-55.) MCDH relied on McPhun's and D'Andrade's agent's intentionally false representations, (*id.*, ¶ 158), which caused McDonald, as MCDH's agent, to wire $10,000 to D'Andrade, (*id.*, ¶¶ 158, 163.) D'Andrade never repaid this principal or the contractually guaranteed return. (*See* Doc. 185-4 at 6, Ex. 1.)

### v. INVESTMENT 9

On or about June 3, 2017, D'Andrade sent McDonald an e-mail, through Robinson, detailing a plan for releasing funds with which to repay MCDH that involved Williams flying

from Austria to Dubai to secure a $3 million loan.  (Doc. 1, ¶¶ 171-74.)  D'Andrade knew the representations were false, made them with the intent to mislead MCDH, and made them with no intent to repay MCDH's $73,000 investment.  (*Id.*, ¶ 177.)  MCDH relied on D'Andrade's intentionally false representations, (*id.*, ¶ 175), which caused MCDH to wire $73,000 to D'Andrade, (*id.*, ¶¶ 172, 178.)  D'Andrade never repaid this principal, the contractually guaranteed return, or the contractual penalties.  (*See* Doc. 185-4 at 7-8, Ex. 1.)

### vi.  INVESTMENT 10

On or about July 7, 2017, McPhun represented to McDonald, via the Investment 10 Agreement, that MCDH's investment was personally guaranteed by McPhun and secured by Maryland properties on Applegate Court and Northgate Road.  (Doc. 1, ¶ 190.)  McPhun knew the representations were false, and made them with the intent to mislead McDonald.  (*Id.*, ¶ 191.)  MCDH relied on McPhun's intentionally false representations, (*id.*, ¶ 195), which caused MCDH to wire $180,000 to a bank account held by EGIII, (*id.*, ¶¶ 192, 196.)  Neither McPhun nor Robinson or EGIII repaid this principal or the contractually guaranteed return.  (*See* Doc. 185-4 at 9, Ex. 1.)

### vii. INVESTMENT 11

On or about August 7, 2017, McPhun told McDonald, via telephone, that he had torpedoed her and Robinson's efforts to repay MCDH by calling one of their alleged lenders, but that she could cure the situation by obtaining a $4-5 million loan if MCDH lent her a $200,000 loan origination fee.  (Doc. 1, ¶ 202.)  McPhun knew the representations were false, and made them with the intent to mislead MCDH.  (*Id.*, ¶¶ 203, 273.)  MCDH relied on McPhun's intentionally false representations, (*id.*, ¶¶ 207, 210), which caused MCDH to wire $160,000 to McPhun, (*id.*, ¶¶ 207, 211.)  McPhun never repaid this principal or the contractually guaranteed

return.  (*See* Doc. 185-4 at 9-10, Ex. 1.)

viii. INVESTMENT 12

On or about December 26, 2017, Robinson, acting as an agent for McPhun, told McDonald, in person, that McPhun had received approximately $5 million from selling properties overseas, and that McPhun was going to take a large tax loss if she did not come up with $56,000 to pay legal fees.  (*Id.*, ¶¶ 212-13.)  Robinson knew the representations were false, and made them with the intent to mislead MCDH into making another investment with McPhun.  (*Id.*, ¶ 213.)  MCDH relied on McPhun's and her agent's intentionally false representations, (*id.*, ¶¶ 214, 217), which caused MCDH to wire $56,000 to Teresa Bunnag, another agent for McPhun that Robinson instructed MCDH to pay, (*id.*, ¶¶ 217, 219.)  Neither McPhun nor her agents repaid this principal or the contractually guaranteed return.  (*See* Doc. 185-4 at 11-12, Ex. 1.)

In sum, the Verified Complaint states claims for fraud against the following defendants in the following amounts:

| Defendant | Transaction | Principal Investment | Contractually Guaranteed Returns | Contractual Penalties | Pre-Judgment Interest | Total Damages |
|---|---|---|---|---|---|---|
| **McPhun** | Devilwood | $150,000 | $ - | $ - | $6,361.64 | $156,361.64 |
| | 3 | $35,000 | $6,300 | $14,775 | $903.35 | $56,978.35 |
| | 7 | $220,000 | $88,000 | $ - | $3,999.78 | $311,999.78 |
| | 10 | $180,000 | $108,000 | $ - | $ - | $288,000 |
| | 11 | $160,000 | $96,000 | $ - | $31,551.89 | $287,551.89 |
| | 12 | $56,000 | $11,200 | $ - | $3,722.70 | $70,922.70 |
| | | **Total: $801,000** | **Total: $309,500** | **Total: $14,775** | **Total: $46,539.36** | **Total: $1,171,814.36** |
| **D'Andrade** | 8 | $10,000 | $10,000 | $ - | $170.96 | $20,170.96 |
| | 9 | $73,000 | $73,000 | $26,000 | $1,583.34 | $173,583.34 |
| | | **Total: $83,000** | **Total: $83,000** | **Total: $26,000** | **Total: $1,754.3** | **Total: $193,754.3** |
| | | **Total: $884,000** | **Total: $392,500** | **Total: $40,775** | **Total: $48,293.65** | **Total: $1,365,568.65** |

(*See* Doc. 185-4 at Ex. 1.)

Economic damages, which include lost profits, are available in cases of fraud.  *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 57 n.3 (Va. 1988); *Network Management Inc. v. Black*, No. 103192, 1991 WL 835252, at *3 (Va. Cir. 1991) (collecting cases).  MCDH is therefore entitled to a judgment of $1,125,275 against McPhun, plus $46,539.36 in pre-judgment interest and $192,000 against D'Andrade, plus $1,754.3 in pre-judgment interest.  (*See* Doc. 185-4, Ex. 1.)  MCDH is also entitled to a judgment for attorneys' fees and costs of at least $395,532.91.  (Doc. 185-5 at 7.)  *See Prospect Development Co., Inc. v. Bershader*, 515 S.E.2d 291, 301 (Va. 1999).

c.      *Punitive damages.*

Punitive damages are available and appropriate under the common law fraud claims.  *See Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 695-96 (E.D. Va. 1990).  In Virginia, there is no fixed formula for calculating punitive damages; rather, it is a matter of discretion for the fact finder.  *See*, *e.g.*, *id.* at 696.  The amount of punitive damages awarded "should bear some reasonable relationship to the actual damages sustained ***and to the measure of the punishment required***."  *Id.* (awarding $526,250.00 in punitive damages, representing half of the actual damages) (quoting *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 747 (Va. 1985)) (emphasis added). The Court should enter a judgment against McPhun and D'Andrade for $350,000, the maximum punitive damages allowed by statute, *see* Va. Code § 8.01-38.1, to reflect the magnitude of harm MCDH suffered; the malicious nature of the Enterprise; and the complete recalcitrance that the Defendants exhibited throughout these proceedings.  This figure is reasonable in relation to the harm suffered, and commensurate with the public's interest in punishing and deterring such flagrant and malicious conduct.

2.    COUNT IV (Business Conspiracy, Va. Code §§ 18.2-499 and -500).

a.    *Legal standard to state a claim for violation of the Virginia Business Conspiracy Statute.*

To recover in an action under Va. Code § 18.2-499 and -500, a plaintiff must establish: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (quoting *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1998)).  It is not necessary for a plaintiff to prove that the defendants acted with actual malice; rather, a plaintiff must "'allege an unlawful act or an unlawful purpose.'" *Id.* (quoting *Hechler Chevrolet, Inc. v. General Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985)).  The term "unlawful act" is defined as "conduct that is not authorized by law; a violation of a civil or criminal law." *Id.* at 317 n.4 (quoting Black's Law Dictionary (9th ed. 2009)).  Upon "prov[ing] that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury." *Gelber v. Glock*, 800 S.E.2d 800, 821 (Va. 2017) (quoting *Beck v. Prupis*, 162 F.3d 1090, 1099 n.18 (11th Cir. 1998) *aff'd* 529 U.S. 494, 501-03 (2000)).  "The crime of conspiracy is complete when the parties agree to commit an offense.  In Virginia, no overt act in furtherance of the underlying crime is necessary." *Speller v. Commonwealth*, 819 S.E.2d 848, 854 (Va. App. 2018) (citations and internal quotation marks and brackets omitted).

b.    *The Verified Complaint states a claim for violation of the Virginia Business Conspiracy Statute against All Defendants.*

The Verified Complaint alleges that Defendants combined and conspired to willfully and maliciously injure MCDH in its business by tortiously and fraudulently inducing MCDH into participating in sham, short-term investments in the ways described in the foregoing section on

14

fraud.  *See supra*, Part II.B.1.   MCDH alleges that this conspiracy's purpose was to misappropriate Plaintiffs' money and divert it for unlawful use by the Enterprise and its members, including Defendants, Williams, and Robinson.[8]  (*See* Doc. 1, ¶¶ 1-3, 25-26, 61-66, 145, 216, 234, 263-66, 278.)

As set forth above, the Verified Complaint states a claim for at least one tortious act of common law fraud by McPhun and D'Andrade against MCDH with respect to the Devilwood Investment and Investments 3 and 7-12.  Each of those tortious acts was committed by at least one of the co-conspirators in furtherance of the Enterprise's unlawful combination and conspiracy.  *See supra*, Part II.B.1.  Additionally, McPhun and D'Andrade have each admitted to engaging in at least one act of criminal wire fraud and their restitution orders illustrate they each engaged in multiple acts of wire fraud as to additional victims of the same scheme or artifice. (*See United States v. McPhun*, Docs 8-9, 27; *United States v. D'Andrade*, Docs 6-7, 27.)   The Verified Complaint also describes other unlawful acts of wire fraud engaged in by McPhun and D'Andrade in furtherance of the conspiracy.  *See also infra*, Part II.B.4.

The Verified Complaint alleges all of the aforementioned fraudulent transactions (*i.e.*, Devilwood and Investments 3 and 7-12) were committed pursuant to and in furtherance of the Defendants combining, conspiring, and mutually undertaking to willfully and maliciously injure MCDH in its business as described in Part II.B.1, *supra*.  The abundance of unlawful acts committed by these co-conspirators in furtherance of the conspiracy amply satisfies the first

---

[8] The Verified Complaint alleges Robinson committed multiple tortious and unlawful acts in furtherance of the conspiracy.  (*See, e.g.*, *id.*, ¶¶ 25-26, 62-63, 65.)  Similarly, Williams pled guilty to eight counts of wire fraud and three counts of engaging in financial transactions with illegal proceeds.  *See United States v. Williams*, Doc. 63.  These are all predicate unlawful acts by members of the Enterprise.

element of this claim.

With respect to the second element, "resulting damages," the Verified Complaint alleges that the Enterprise "fraudulently obtained more than $884,000 from Plaintiffs," (Doc. 1, ¶ 2), and that "Plaintiffs have been injured by reason of Defendants' statutory conspiracy in an amount no less than $1.6 million," (*id.*, ¶ 266).   Therefore, Plaintiffs have pled sufficient facts to state a claim for violation of the Virginia Business Conspiracy Statute against all Defendants.[9]  *See T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC*, 385 F.3d 836, 845-46 (4th Cir. 2004) (holding that the complaint "properly pleaded a claim for both statutory conspiracy and common law conspiracy" under Virginia law because it alleged that the defendants "combined to terminate and interfere with the contractual relationship between Ms. Brenna and Slater & Son" by acting "together to complete the sale of the farm without paying Slater & Son").

<em>c.     Damages for statutory conspiracy claims.</em>

Because Defendants are each jointly and severally liable for each tortious act committed by a co-conspirator in furtherance of the conspiracy, they are all liable for the full amount of MCDH's compensatory damages of $1,365,568.65, which includes MCDH's principal investment ($884,000), contractually guaranteed returns ($392,500), contractual penalties ($40,775), and contractually guaranteed and statutory pre-judgment interest ($48,293.65).  (*See* Doc. 185-4, Ex. 1.)  Plaintiffs are entitled to treble damages and attorneys' fees and costs under Va. Code § 18.2-500.   Trebling Plaintiffs' compensatory damages and interest yields a total

---

[9] Even though the Verified Complaint does not allege Cadem or Choice Management committed the tortious misrepresentations made in connection with the Devilwood Investment and Investments 3, 7-12, Cadem and Choice Management are nonetheless fully liable for all tortious misrepresentations as co-conspirators.  *See*, *e.g.*, *Gelber*, 800 S.E.2d at 821; *Speller*, 819 S.E.2d at 854.

16

damages award of $4,096,705.95. The Court should also award attorneys' fees and costs for at least $395,532.91. (*See* Doc. 185-5 at 7.)

        3.      <u>COUNT V (Common Law Conspiracy)</u>.

        *a.      Legal standard to state a claim for common law conspiracy.*

To state a claim for common law conspiracy, a plaintiff must show "'1) an agreement between two or more persons; 2) to participate in an unlawful act, or a lawful act in an unlawful manner; 3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and 4) that the overt act was done pursuant to and in furtherance of the common scheme.'" *Skillstorm, Inc. v. Electronic Data Sys., LLC*, 666 F. Supp. 2d 610, 618 (E.D. Va. 2009) (quoting *Flexible Benefits Council v. Feltman*, No. 1:09-cv-371-JCC, 2008 WL 2465457, at *9 (E.D. Va. June 16, 2008)); *see also, e.g.*, *Hechler Chevrolet, Inc. v. General Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985). The same factual allegations and circumstances supporting Plaintiffs' statutory conspiracy claim also support the common law conspiracy claim. *See, e.g.*, *T.G. Slater & Son*, 385 F.3d at 845-46. Defendants are jointly liable to MCDH under the common law conspiracy claim for the full amount of MCDH's compensatory damages of $1,365,568.65.

        4.      <u>COUNT I-III (Violations of the RICO Act, 18 U.S.C. § 1962(b)-(d)</u>.

Plaintiffs have sufficiently pled RICO claims against McPhun and D'Andrade.

        *a.      Legal standard to state a claim under the RICO Act.*

To state a civil claim for RICO violations, the plaintiff must allege facts establishing (1) conduct (2) of an ***enterprise*** (3) through a ***pattern*** (4) of ***racketeering activity***, and (5) ***consequent economic injury***. *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)) (emphases added to denote key

17

elements).   An "enterprise" may be "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A "pattern of racketeering activity" is defined as requiring at least two of any number of predicate acts by the enterprise.  *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. § 1961(1)(B), (5)).

Counts I - III state RICO claims against McPhun and D'Andrade for engaging in three different types of activities prohibited by 18 U.S.C. § 1962(b), (c), and (d).

- Section 1962(b) prohibits, "any person through a pattern of racketeering activity . . . directly or indirectly," from acquiring or maintaining, "any ***interest in or control of*** any enterprise which is engaged in, or the activities of ***which affect, interstate or foreign commerce***."  (Emphasis added.)

- Section 1962(c) prohibits, "any person . . . associated with any enterprise engaged in, or the activities of which affect, ***interstate or foreign commerce***, to conduct or ***participate,*** directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  (Emphasis added.)

- Section 1962(d) prohibits ***conspiracies*** to violate any of the provisions of 18 U.S.C. § 1962(a), (b) or (c).  (Emphasis added.)

MCDH pled all required elements under each of these RICO theories.

   b.   *The Verified Complaint alleges an association in fact Enterprise.*

Under each RICO theory, MCDH alleged that McPhun and D'Andrade were part of an association in fact enterprise formed for the common purpose of duping unwitting investors, like MCDH, into investing in the Enterprise's fraudulent ventures.  (Doc. 1, ¶¶ 1, 61, 241, 250, 258.)

   c.   *The Verified Complaint alleges McPhun and D'Andrade engaged in a pattern of racketeering activity.*

The Verified Complaint alleges McPhun and D'Andrade committed more than two predicate acts of racketeering, including acts of wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), or engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957).  (*See* 18 U.S.C. § 1961(1)(B); Doc. 1, ¶¶ 243-44, 253-54,

259-60.)   More specifically, the Verified Complaint identifies *dozens* of instances of McPhun

and D'Andrade using e-mail, telephone, and bank wires in furtherance of the Enterprise's

unlawful objectives.   Where a complaint "sets forth that [the defendants] were knowing

participants in a scheme to defraud, each mailing or wire transmission in furtherance of the fraud

scheme constitutes a separate offense." *Southwood v. Credit Card Sol.*, No. 7:09-CV-81-F, 2012

WL 12895545, at *12 (E.D.N.C. Oct. 23, 2012).   Thus, *any* use of a wire in furtherance of a

fraudulent scheme can constitute wire fraud for purposes of establishing a civil RICO claim.

*Accord United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012) ("The essential elements of

a wire fraud offense are (1) the existence of a scheme to defraud and (2) the use of . . . a wire

communication in furtherance of the scheme." (internal citation and quotation marks omitted)).

McPhun's pattern of engaging in acts of wire fraud in interstate commerce includes:

| Date | Type of Wire | Wire Fraud/Racketeering Conduct | Verified Complaint Cite |
|---|---|---|---|
| 11/22/16 | E-Mail | McPhun, a Maryland resident, emailed Robinson, a DC resident, a fake letter of intent for Devilwood, which Robinson forwarded by email to McDonald, a Maryland resident, with McPhun and Robinson knowing that Devilwood would not be purchased, in order to induce MCDH, a Virginia company located in Herndon, into wiring $150,000 to McPhun's company, Choice Management, an LLC in Nevada. | ¶ 45 |
| 01/27/17 | E-Mail | McPhun (MD) sent Robinson (DC) a lengthy email and sent him other fraudulent documents espousing false excuses for her delayed return of MCDH's (VA) Devilwood investment for the purposes of testing MCDH's risk tolerance for getting involved in other "investments." | ¶¶ 52-58 |
| 04/19/17 | Phone Call and Bank Wire | McPhun (MD) falsely told McDonald (MD) by phone that Williams was not going to be part of the D'Andrade Project, which induced MCDH (VA) to send $220,000 to Cadem (MD) by bank wire. | ¶¶ 139-41 |

| Date | Type of Wire | Wire Fraud/Racketeering Conduct | Verified Complaint Cite |
|------|------|------|------|
| Late June 2017 | Phone Calls and Bank Wire | On a phone call with McDonald (MD), McPhun (MD) provided false excuses for why she and D'Andrade (CA/DC) had not paid MCDH (VA) for the D'Andrade Project investments.  On a second call McPhun told McDonald she had another investment that was separate and apart from the D'Andrade Project that, would repay MCDH in full, which was false.  This call induced MCDH to wire $180,000 to Robinson's District of Columbia company, EGIII. | ¶¶ 182-92 |

D'Andrade's pattern of engaging in acts of wire fraud in interstate commerce includes:

| Date | Type of Wire | Statement | Verified Complaint Cite |
|------|------|------|------|
| 05/17/17 | E-Mail | D'Andrade (CA/DC) emailed Robinson (DC) a contract (the "Investment 8 Agreement"), which was written on CBX Technologies, Inc. letterhead from D'Andrade's California company, to be forwarded by email to McDonald (MD), intending to induce MCDH (VA) to wire D'Andrade $10,000 and neither Robinson nor D'Andrade had any intent to repay MCDH. | ¶¶ 156-64 |
| 05/17/17 | Wire Transfer | MCDH (VA) wired D'Andrade (CA/DC) $10,000 in reliance on D'Andrade's fraudulent Investment 8 Agreement. | ¶ 158 |
| 06/03/17 | E-Mail | D'Andrade (CA) emailed Robinson (DC) a contract (the "Investment 9 Agreement"), to be forwarded by email to McDonald (MD), intending to induce MCDH (VA) to wire D'Andrade $73,000 and neither Robinson nor D'Andrade had any intent to repay MCDH. | ¶ 169-79; Doc. 185-4 at 7-8 |
| 07/16/17 | E-mail | D'Andrade (CA/DC) caused Robinson to send MCDH (VA) an email attaching a fraudulent "proof of funding" document D'Andrade prepared which falsely asserted that D'Andrade had a loan commitment in order to induce MCDH's payment of Investment 11, a $160,000 wire to McPhun (MD). | ¶¶ 197-207, 210 |

McPhun's engagement in more than two acts of wire fraud in interstate commerce is

further evidenced by her criminal plea to one count of wire fraud, and the criminal restitution order mandating her to pay restitution to five other victims of the same scheme and artifice to defraud experienced by MCDH – solicitation of funds under false pretenses that the investments were in real estate.  (*See United States v. McPhun*, Docs. 8, 9, 21, 27.)

D'Andrade's engagement in at least two acts of wire fraud in interstate commerce is similarly established by his criminal plea to one count of wire fraud and the criminal restitution order mandating he pay restitution to 32 victims, including $68,000 to MCDH.  (*See United States v. D'Andrade*, Doc. 27.)   This order of restitution to MCDH is based in part on D'Andrade's admission in a text message that he lied to McDonald to induce MCDH's payment of Investment 9.  (*See id.*, Docs. 20 at 2-3, 21 at 1-2, 27; *see also* Doc. 1, ¶¶ 169-77.)

The Verified Complaint also sufficiently alleges McPhun and D'Andrade committed multiple acts of money laundering.  (*Id.*, ¶¶ 244, 253, 259; *see also United States v. Smith*, 44 F.3d 1259, 1263 (4th Cir. 1995); *United States v. Okun*, No. 3:08-CR-132, 2009 WL 313012, at *9 (E.D. Va. Feb. 18, 2009).)  In *Hanson v. First National Bank*, the plaintiff filed a RICO suit in connection with an alleged Ponzi scheme.  He alleged that the defendant "'undertook to conceal his role in the Scheme by laundering money through an unwitting third party, in violation of 18 U.S.C. § 1956.'"  No. 5:10-CV-906, 2011 WL 13229375, at *5 (S.D.W. Va. Aug. 1, 2011) (quoting the complaint).  The court denied a motion to dismiss challenging the sufficiency of the money laundering allegations, finding:

> [T]he allegations in the complaint read *in totem* present adequate facts to support this predicate claim as to [the defendant].  Plaintiff alleges that [the defendant] had knowledge of the scheme to defraud investors and customers of the enterprise, that he, in his role as a director of the Bank, facilitated the transferring of fraudulently-obtained funds as well as the Bank's financial support of the enterprise, and that he participated in "check-kiting" to conceal the fraudulent transactions.  Taken together, these facts support a claim of money laundering and Plaintiff has pleaded a predicate offense for a RICO violation as to [the

21

defendant].

*Id.* (internal quotation marks and citation omitted).   The same is true here.   The Verified Complaint read *in totem* alleges that McPhun and D'Andrade had knowledge of the scheme to defraud MCDH and others, that they facilitated the transfer of fraudulently-obtained funds through a number of intermediaries, including, for example, EGIII, Choice Management, and Teresa Bunnag, and did so to conceal and obfuscate the nature of their fraudulent scheme.

For all of the foregoing reasons, that McPhun and D'Andrade each engaged in a pattern of racketeering activity is amply alleged and established.

> d.       *The Verified Complaint alleges all necessary elements for civil RICO claims under 18 U.S.C. § 1962(b), (c), or (d).*

Count I under § 1962(b) alleges McPhun and D'Andrade acquired or maintained, directly or indirectly, an interest in and control over the Enterprise through a pattern of racketeering activity.   (Doc. 1.  ¶¶ 243-44.)   McPhun's and D'Andrade's interest in and control over the Enterprise is illustrated by their dominance over Robinson, who acted as their agent and broker; their direct receipt of numerous checks and wire payments from MCDH; and their roles as the persons promised to have the resources to deliver returns on MCDH's investments.

Count II under § 1962(c) is sufficiently alleged because the Verified Complaint as a whole alleges McPhun and D'Andrade participated in the Enterprise through a pattern of racketeering activity.  (*See id.*, ¶¶ 250-54.)   The Supreme Court has interpreted use of the term "participate" in § 1962(c) as referring to participating in the operation or management of the enterprise and that the participation is not limited to those with primary responsibility for the enterprise's affairs.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).   The Verified Complaint alleges myriad acts of participation in the Enterprise by McPhun and D'Andrade.

Count III under § 1962(d) is sufficiently alleged because the Verified Complaint alleges

McPhun and D'Andrade conspired to violate § 1962(b) & (c).   (*See supra*, Part II.B.2-3 (discussing statutory and common law conspiracy claims.)

> e.   *Damages for RICO violations.*

The Verified Complaint alleges that MCDH suffered specific monetary losses as a result of McPhun's and D'Andrade's violations of the RICO statute under all three theories.   (*See* Doc. 1, ¶¶ 246, 255, 261.)  McPhun and D'Andrade are both liable for the full amount of MCDH's compensatory damages of $1,365,568.65, which includes MCDH's principal investment ($884,000), contractually guaranteed returns ($392,500), contractual penalties ($40,775), and contractually guaranteed and pre-judgment interest ($48,293.65).  *See supra*, Part II.B.1.  MCDH is also entitled to treble damages, totaling $4,096,705.95.   (Doc. 185-4.)   *See* 18 U.S.C. § 1964(c).

> 5.   COUNT VII (Violations of the SEC Act of 1934 and the Exchange Act Rule 10b-5).

> a.   *Legal standard to state a federal securities law claim.*

Under 15 U.S.C. § 78j(b), it is illegal to use any deceptive device in connection with the sale or purchase of securities[10] in contravention of the SEC's rules and regulations.  SEC Rule

---

[10] "The term 'securities' includes a 'certificate of interest or participation in any profit sharing agreement,' as well as an 'investment contract,' which is defined as 'a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.'"  *Obenauer*, 736 F. Supp. at 692 (quoting *United States Sec. & Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 297-99 (1946)); *see also* 15 U.S.C. § 78c(a)(10).  Because McPhun and D'Andrade failed to participate in discovery, and did not produce evidence of what they did with MCDH's funds, from an evidentiary perspective, Plaintiffs do not know whether any of the subject investments would be investment contracts.  Therefore, the Private Securities Litigation Reform Act's ("PSLRA") Amendment to the RICO Act, *see* Pub. L. No. 104-67, § 107, should not be presumed to apply in these default proceedings.  Even if the Court finds that the PSLRA is applicable, treble damages are nonetheless available and warranted under the Virginia Business Conspiracy Statute (Va. Code § 18.2-500).  *See supra*, Part II.B.2.

10b–5 proscribes "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the sale or purchase of securities.  17 C.F.R. § 240.10b-5.

> b.  *The Verified Complaint states a claim under 15 U.S.C. §78j(b) and 17 C.F.R. § 204.10b-5 ("Rule 10b-5").*

The Verified Complaint alleges the Devilwood Investment and Investments 3 and 7-12 each constitute a security within the meaning of federal securities laws because they were investments in a common venture, through which MCDH expected its profits to come solely from the efforts of others.  (*See* Doc. 1, ¶¶ 73-74, 133-34, 160-61, 193-94, 208-09, 277.)  As described above in Part II.B.1, McPhun committed fraud in connection with the Devilwood Investment and Investments 3, 7, 10-12, and D'Andrade committed fraud in connection with Investment 8 and 9.  McPhun and D'Andrade, either themselves or by their agent Robinson, made the multiple false representations with the intent to mislead and induce MCDH into the aforementioned investments.  (*Id.*, ¶¶ 278, 284.)

> c.  *Damages for federal securities law claims.*

"The appropriate measure of damages in a federal securities case under Rule 10b–5 is the difference between the value of the consideration paid and the value of the securities received." *Obenauer*, 736 F. Supp. at 694 (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972)).  MCDH received nothing in exchange for the above described Investments. Therefore, MCDH's damages recoverable for securities fraud against McPhun and D'Andrade are $801,000 and $83,000, respectively, as set forth in the table in Part II.B.1.  (*See* Doc. 185-4.)

> 6.  COUNT VIII (Violations of Va. Code §§ 13.1-522, *et seq.*).

> a.  *Standard to state a claim under Va. Code §§ 13.1-522, et seq.*

Section 13.1–522 of the Virginia Securities Act, like the federal securities laws,

proscribes the making of fraudulent or misleading statements in connection with the sale or purchase of securities.[11]   "The elements of a state law fraud claim are essentially the same as those necessary to establish a [15 U.S.C. § 78j(b)] claim, except that fraud must be proved by clear and convincing evidence."  *Carlucci v. Han*, 886 F. Supp. 2d 497, 527 (E.D. Va. 2012) (citing *Arabian v. Bowen*, 966 F.2d 1441, 1992 WL 154026, at *5 (4th Cir. July 7, 1992)). Unlike its federal counterpart, the Virginia Securities Act does not require scienter.  A plaintiff need not establish that the fraudulent representation was made knowingly or with reckless indifference to its truth or falsity; the mere fact of the issuance of the statement is enough." *Obenauer*, 736 F. Supp. at 694.

> b.    *The Verified Complaint states a claim under Va. Code §§ 13.1-522, et seq.*

As discussed above, McPhun committed securities fraud in connection with the Devilwood Investment and Investments 3, 7, and 10-12; and D'Andrade committed fraud in connection with Investments 8 and 9.  Because the Verified Complaint alleges each of these Investments was a security, MCDH has stated a claim for securities fraud under Va. Code § 13.1–522, *et seq.*

> c.    *Damages for state securities law claims*.

The damages recoverable under Va. Code § 13.1–522 are the same as the damages available under federal securities law, plus 6% interest on each security from the date of purchase, and attorneys' fees and costs.  *See Prudential-Bache Securities, Inc. v. Cullather*, 678

---

[11] Virginia law defines a "security" as "any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or **participation in any profit-sharing agreement** . . . or . . . any guarantee of . . . any of the foregoing."  Va. Code § 13.1–501.A. (emphasis added).

F. Supp. 601, 605 (E.D. Va. 1987).  Therefore, under Count VIII, McPhun is liable to MCDH in the amount of (a) $801,000, the total value MCDH paid under the Devilwood Investment and Investments 3, 7, 10-12; (b) plus 6% pre-judgment interest thereon beginning on December 27, 2017, the date MCDH purchased Investment 12 ($52,605); and (c) attorneys' fees and costs totaling $395,532.91.  (*See* Doc. 185-5 at 7.)  D'Andrade is liable to MCDH in the amount of (a) $83,000, the value MCDH paid under Investments 8 and 9; (b) plus 6% pre-judgment interest thereon beginning on June 5, 2017, the date MCDH purchased Investment 9 ($7,470); and (c) attorneys' fees and costs totaling $395,532.91.  (*See id.*)

       7.       <u>COUNT IX (Breach of Contract)</u>.

           *a.*      *Legal standard to state a claim for breach of contract.*

Under Virginia law, the elements of a breach of contract action are "'(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'"  *Navar, Inc. v. Federal Business Council*, 784 S.E.2d 296, 299 (Va. 2016) (quoting *Ulloa v. QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006)).  With respect to damages, a plaintiff must "'show a causal connection between the defendant's wrongful conduct and the damages asserted,'" and "'prove the amount of those damages . . . .'"  *Id.* (quoting *Saks Fifth Ave., Inc. v. James, Ltd.*, 630 S.E.2d 304, 311 (Va. 2006)).

           *b.*      *The Verified Complaint states claims for breach of contract against McPhun, individually and on behalf of Cadem and Choice Management; and D'Andrade.*

The Verified Complaint states claims for breach of contract as to (1) McPhun individually with respect to the Investment 10 and 12 Agreements; (2) McPhun, individually and on behalf of Choice Management with respect to the Investment 11 Agreement; (3) McPhun, individually and on behalf of Cadem with respect to the Investment 7 Agreement; and (4)

26

D'Andrade individually with respect to the Investment 8 and 9 Agreements.  Plaintiffs have

prepared a chart, attached hereto as Exhibit 1, summarizing in detail the factual allegations in the

Verified Complaint supporting each element of each breach of contract theory pled.

c.      <em>Damages for breach of contract.</em>

As set forth in the McDonald Damages Affidavit, MCDH is entitled to recover the

following compensatory damages with respect to each Investment, which includes MCDH's

principal investment, contractually guaranteed returns, and contractual penalties:

| Liable Defendant(s) | No. | Principal Investment | Contractually Guaranteed Returns | Contractual Penalties | Pre-judgment Interest | Total Damages |
|---|---|---|---|---|---|---|
| McPhun and Cadem | 7 | $220,000 | $88,000 | - | $3,999.78 | $311,999.78 |
| D'Andrade | 8 | $10,000 | $10,000 | - | $170.96 | $20,170.96 |
| D'Andrade | 9 | $73,000 | $73,000 | $26,000 | $1,583.34 | $173,583.34 |
| McPhun | 10 | $180,000 | $108,000 | - | - | $288,000 |
| McPhun and Choice Management | 11 | $160,000 | $96,000 | - | $31,551.89 | $287,551.89 |
| McPhun | 12 | $56,000 | $11,200 | - | $3,722.70 | $70,922.70 |

(Doc. 185-4, Ex. 1.)

8.      <u>COUNT XI (Conversion).</u>

a.      <em>Legal standard to state a claim for conversion.</em>

Under Virginia law, conversion is "the wrongful exercise or assumption of authority over

another's goods, depriving the owner of their possession, or any act of dominion wrongfully

exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*,

544 S.E.2d 666, 679 (Va. 2001); *see also Federal Ins. Co v. Smith*, 144 F. Supp. 2d 507, 517-18

(E.D. Va. 2001) ("[A] plaintiff asserting a conversion claim must prove by a preponderance of

27

the evidence (i) the ownership or right to possession of the property at the time of the conversion and (ii) the defendant's conversion by the wrongful exercise of dominion or control over the plaintiff's property, depriving plaintiff of possession.") (citing *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (1956)).  Money is subject to conversion.  *See PGI, Inc. v. Rathe Productions, Inc.*, 576 S.E.2d 438, 443 (Va. 2003).  Moreover, a "cause of action for conversion lies independent of an action in contract and may provide a separate basis, distinct from the contract, upon which one partner may sue another."  *Id.*

> b. *The Verified Complaint states a claim for conversion against Choice Management, McPhun, and D'Andrade in connection with the Devilwood Investment and Investments 7, 8, 9, and 11.*

The Verified Complaint alleges that the following Defendants wrongfully exercised and assumed authority over MCDH's funds, depriving MCDH of those funds:

| Transaction | Amount | Defendant liable for conversion | Verified Complaint Cite |
|---|---|---|---|
| **Devilwood** | $150,000 | Choice Management | ¶¶ 43-44, 48, 300-04 |
| **Investment 7** | $220,000 | McPhun | ¶¶ 125-44, 300-04 |
| **Investment 8** | $10,000 | D'Andrade | ¶¶ 152-64, 300-04 |
| **Investment 9** | $73,000 | D'Andrade | ¶¶ 169-79, 300-04 |
| **Investment 11** | $160,000 | McPhun | ¶¶ 197-211, 300-04 |

MCDH is thus entitled to recover a total of $150,000 in funds unlawful converted by Choice Management; $380,000 in funds unlawful converted by McPhun; and $83,000 in funds unlawful converted by D'Andrade.

> 9.    <u>COUNT X (Unjust Enrichment)</u>.

> a. *Legal standard to state a claim for unjust enrichment.*

"To recover on an unjust enrichment theory, the claimant must show: (1) he conferred a benefit on the other party; (2) the other party had knowledge that the claimant was conferring the

benefit; and (3) the other party accepted the benefit under circumstances that render it inequitable for him to retain the benefit without paying for the value he received." *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 724-25 (E.D. Va. 2010) (citing *Nossen v. Hoy*, 750 F. Supp. 740, 745 (E.D. Va. 1990)). An "unjust enrichment claim arises when there is no contractual relationship." *Aerotek, Inc. v. Tyonek Native Corp.*, No. 1:05-cv-1080-JCC, 2005 WL 3372872, at *3 (E.D. Va. Dec. 8, 2005). Rather, "this implied or quasi-contract is based on equitable principles." *Kern v. Freed Co., Inc.*, 299 S.E.2d 363, 365 (Va. 1983). The Verified Complaint does not claim breach of contract against D'Andrade or the McPhun Defendants with respect to Devilwood or Investment 3. However, the Verified Complaint does state a claim for unjust enrichment with respect to these transactions.

> b.    *The Verified Complaint states a claim for unjust enrichment against McPhun in the amount of $35,000.*

The Verified Complaint alleges MCDH conferred a benefit on McPhun by providing her and the Enterprise $35,000 pursuant to the terms of the Investment 3. (Doc. 1, ¶¶ 61-81, 60.) McPhun knew that MCDH was conferring the benefit, and McPhun accepted the benefit with no intention of using the funds as required by Investment 3. (*Id.*, ¶¶ 79-81.) McPhun, misappropriated and used the funds for her own benefit. (*Id.*) As a result, MCDH is entitled to $35,000 in damages from McPhun under Count X.

> c.    *The Verified Complaint states a claim for unjust enrichment against McPhun and Choice Management in the amount of $150,000.*

The Verified Complaint alleges MCDH conferred a benefit on McPhun and Choice Management by wiring Choice Management $150,000 pursuant to the terms of the Devilwood Project. (*Id.*, ¶¶ 44-50, 60.) McPhun and Choice Management knew that MCDH was conferring the benefit, and accepted the benefit with no intention of using the funds as required by the

Devilwood Investment. In fact, all of the contract and purchase related documents McPhun presented MCDH regarding Devilwood were fraudulently drafted to mislead MCDH, and neither McPhun nor Choice Management had any intention of acquiring Devilwood. (*Id.*, ¶¶ 49-60.) As a result, MCDH is entitled to $150,000 in damages from McPhun under Count X.

## III.   CONCLUSION.

For the reasons set forth herein, and the McDonald Damages Affidavit and Attorneys' Fees Declaration, Plaintiffs respectfully request that the Court enter default judgment in favor of MCDH against Defendants, jointly and severally, in the following amounts: (1) $4,096,705.95, which includes $1,365,568.65 in compensatory damages and treble damages, as authorized pursuant to 18 U.S.C. § 1964(c) and Va. Code § 18.2-500; (2) at least $395,532.91 in attorneys' fees and expenses, authorized pursuant to Va. Code §§ 18.2-500 and 13.1-522; and post-judgment interest at the statutory rate of 6% pursuant to Va. Code § 6.2-302.

Dated: January 23, 2019                              Respectfully submitted,

                                                     */s/ Cathy A. Hinger*
                                                     Cathy A. Hinger (VSB No. 46293)
                                                     Lela M. Ames (VSB No. 75932)
                                                     Pascal F. Naples (VSB No. 87849)
                                                     WOMBLE BOND DICKINSON (US) LLP
                                                     1200 Nineteenth Street, N.W.
                                                     Suite 500
                                                     Washington, DC  20036
                                                     Tel:    (202) 857-4489
                                                     Fax:    (202) 261-0029
                                                     E-mail: Cathy.Hinger@wbd-us.com
                                                     E-mail: Lela.Ames@wbd-us.com
                                                     E-mail: Pascal.Naples@wbd-us.com

                                                     *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 23rd day of January, 2019, a copy of the foregoing **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENTS AGAINST D'ANDRADE AND MCPHUN DEFENDANTS**, was filed with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

Carla D. McPhun
16913 Harbour Town Drive
Silver Springs, MD 20905
E-mail: carladmcphunlegal@gmail.com

*Pro Se, Individually and for Cadem Capital Group and Choice Management, LLC*

Jack Hanly
Grace L. Hill
Assistant United States Attorneys
2100 Jamieson Ave.
Alexandria, VA 22314
grace.hill@usdoj.gov

*Attorneys for Intervenor*

      Via U.S. First-Class Mail on the following:

Christian D'Andrade
642 North L Street
Unit B
Livermore, CA  94550

*Pro Se*

      Chambers copy via FedEx, for delivery on January 24, 2019, on the following:

U.S. District Court, Eastern District of Virginia
Clerk's Office
Attn: Hon. Leonie M. Brinkema
401 Courthouse Square
Alexandria, VA 22314

                                      */s/ Cathy A. Hinger*
                                        Cathy A. Hinger